# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 6, 2013          Decided June 25, 2013

No. 12-5413

INVESTMENT COMPANY INSTITUTE AND CHAMBER OF
COMMERCE OF THE UNITED STATES OF AMERICA,
APPELLANTS

v.

COMMODITY FUTURES TRADING COMMISSION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00612)

*Eugene Scalia* argued the cause for appellants. On the briefs were *Robin S. Conrad* and *Rachel Brand*. *Daniel T. Davis* entered an appearance.

*Steven G. Bradbury* and *Susan Ferris Wyderko* were on the brief for *amici curiae* Mutual Fund Directors Forum, et al. in support of appellants.

*Jonathan L. Marcus*, Deputy General Counsel, U.S. Commodity Futures Trading Commission, argued the cause for appellee. With him on the brief were *Dan M. Berkovitz*, General Counsel, *Robert A. Schwartz*, *Nancy R. Doyle*, and *Martin B. White*, Assistant General Counsel, and *Melissa Chiang*, Counsel.

*John M. Devaney*, *Martin E. Lybecker*, *Dennis M. Kelleher*, and *Stephen W. Hall* were on the brief for *amici curiae* The National Futures Association, et al. in support of appellee.

Before: GARLAND, *Chief Judge*, BROWN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: The Investment Company Institute and the Chamber of Commerce of the United States brought this action against the Commodity Futures Trading Commission (CFTC), seeking a declaratory judgment that recently adopted regulations of the Commission regarding derivatives trading were unlawfully adopted and invalid, and seeking to vacate and set aside those regulations and to enjoin their enforcement. The district court granted summary judgment in favor of the Commission. Because we agree with the district court that the Commission did not act unlawfully in promulgating the regulations at issue, we affirm.

## I. BACKGROUND

*A. Regulatory History*

The Commodity Exchange Act (CEA), Title 7, United States Code, Chapter 1, establishes and defines the jurisdiction of the Commodity Futures Trading Commission. Under this Act, the Commission has regulatory jurisdiction over a wide variety of markets in futures and derivatives, that is, contracts deriving their value from underlying assets. *See* 7 U.S.C. § 2(a). In addition to establishing the regulatory authority of the Commission, the CEA also directly imposes certain duties on regulated entities. As relevant here, the Act requires that

Commodity Pool Operators (CPOs) register with CFTC and adhere to regulatory requirements related to such issues as investor disclosures, recordkeeping, and reporting. 7 U.S.C. §§ 6k, 6n; 17 C.F.R. §§ 4.20–4.27. The CEA defines CPOs as entities "engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise" that buy and sell securities "for the purpose of trading in commodity interests." 7 U.S.C. § 1a(11)(A)(i). The CEA, however, empowers CFTC to exclude an entity from regulation as a CPO if CFTC determines that the exclusion "will effectuate the purposes of" the statute. *Id.* § 1a(11)(B).

Since 1985, the Commission has exercised its authority to exclude "otherwise regulated" entities through § 4.5 of its regulations. *See* Commodity Pool Operators, 50 Fed. Reg. 15,868 (Apr. 23, 1985) (codified at 17 C.F.R. § 4.5). Under the version of § 4.5 that applied before amendments of 2003, otherwise regulated entities could claim exclusion by meeting certain regulatory conditions. These conditions included that the entity:

> (i) Will use commodity futures or commodity options contracts solely for bona fide hedging purposes . . . [;] (ii) Will not enter into commodity futures and commodity options contracts for which the aggregate initial margin and premiums exceed 5 percent of the fair market value of the entity's assets . . . [;] (iii) Will not be, and has not been, marketing participations to the public as or in a commodity pool or otherwise as or in a vehicle for trading in the commodity futures or commodity options markets; [and,] (iv) Will disclose in writing to each prospective participant the purpose of and the limitations on the scope of the commodity futures and commodity options trading in which the entity intends to engage[.]

*Id.* at 15,883. These conditions were amended slightly in 1993, when CFTC promulgated a rule removing the bona fide hedging requirement and excluding bona fide hedging from the trading threshold. Commodity Pool Operators, 58 Fed. Reg. 6,371, 6,372 (Jan. 28, 1993). Under these conditions, there was no automatic exclusion for registered investment companies, or "RICs," regulated by the Securities and Exchange Commission pursuant to the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 to -64. Therefore, a commodity pool operator that was also a registered investment company was included within CFTC's regulatory definition of CPOs unless it met all of the § 4.5 requirements for exclusion.

In 2000, Congress enacted the Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763. That statute barred CFTC and SEC from regulating most "swaps," a type of derivative involving the exchange of cash flows from financial instruments. *See* 7 U.S.C. § 2(d). Responsive to the statutory change, the Commission amended its requirements for exclusion to eliminate the five percent ceiling. *See* Additional Registration and Other Regulatory Relief for Commodity Pool Operators and Commodity Trading Advisors, 68 Fed. Reg. 47,221, 47,224 (Aug. 8, 2003). These 2003 amendments "effectively excluded RICs from the CPO definition," freeing registered investment companies from most CFTC CPO regulations. *Investment Company Institute v. CFTC*, 891 F. Supp. 2d 162, 172 (D.D.C. 2013). CFTC viewed its 2003 amendments as consistent with the deregulatory spirit of the 2000 statute. *See* 68 Fed. Reg. at 47,223.

In 2010, the Commission began shifting back to a more stringent regulatory framework. This shift came in the wake of the 2007–2008 financial crisis, which many attributed to poorly regulated derivatives markets, when Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub.

L. No. 111-203, 124 Stat. 1376 (2010) (codified as amended in scattered sections of the U.S. Code).  As relevant here, Dodd-Frank repealed several statutory provisions that had excluded certain commodities transactions from CFTC oversight.  *Id.* §§ 723, 734.  Dodd-Frank also gave CFTC regulatory authority over swaps, and amended the statutory definition of commodity pool operators to include entities that trade swaps. *Id.* §§ 721(a), 722.  Dodd-Frank, however, did not affect CFTC's authority to set exclusion requirements for CPOs.

*B.  Rulemaking Process*

After Congress passed Dodd-Frank, the National Futures Association (NFA), to which all CPOs must belong, filed a petition of rulemaking with CFTC requesting that CFTC amend § 4.5 to limit the scope of its exclusion for registered investment companies. *See* Petition of the National Futures Association, 75 Fed. Reg. 56,997 (Sept. 17, 2010).  In NFA's view, mutual funds were using the relaxed § 4.5 standards to evade CFTC oversight of their derivative operations, reducing transparency and potentially harming the public because no other regulator had rules equivalent to CFTC's.  *See Investment Company Institute*, 891 F. Supp. 2d at 175–76.  Therefore, NFA asked CFTC to restore the trading threshold and public marketing prohibition requirements to § 4.5 for any registered investment company seeking exclusion from CPO status. *See* 75 Fed. Reg. at 56,998.  In essence, NFA sought a return to the pre-2003 regulatory framework, but only for registered investment companies.

On February 11, 2011, CFTC proposed new regulations that would amend § 4.5 "to reinstate the pre-2003 operating criteria" for all registered investment companies.  Commodity Pool Operators and Commodity Trading Advisors: Amendments to Compliance Obligations, 76 Fed. Reg. 7,976, 7,984 (Feb. 11,

2011).  One notable difference from the 2003 framework is that because of Dodd-Frank's extension of CFTC authority to swaps, the regulations proposed that swaps be included in the trading thresholds.  *See id.* at 7,989.  The proposed regulations also required certified regular reports from CPOs, a requirement that would be contained in a new § 4.27.  *See id.* at 7,978.  CFTC provided four explanations for these proposed regulations:  First, the regulations would align CFTC's regulatory framework "with the stated purposes of the Dodd-Frank Act."  *Id.*  Second, they would "encourage more congruent and consistent regulation of similarly situated entities among Federal financial regulatory agencies."  *Id.*  Third, they would "improve accountability and increase transparency of the activities of CPOs" and commodity pools.  *Id.*  Fourth, they would make it easier to collect data for the Financial Stability Oversight Council ("FSOC"), a new body created by Dodd-Frank charged with "identify[ing] risks to the financial stability of the United States."  *Id.*; Dodd-Frank Act § 112 (codified at 12 U.S.C. § 5322).

After the public comment period expired, CFTC promulgated a Final Rule amending § 4.5 and adding § 4.27 largely as proposed.  *See* Commodity Pool Operators and Commodity Trading Advisors: Compliance Obligations, 77 Fed. Reg. 11,252 (Feb. 24, 2012), as corrected due to Fed. Reg. errors in its original publication, 77 Fed. Reg. 17,328 (Mar. 26, 2012); *see also* 17 C.F.R. §§ 4.5, 4.27.  The primary difference between the proposed rule and the Final Rule is that, to be eligible for exclusion, a RIC's non-bona fide hedging trading must be less than or equal to five percent of the liquidation value of the entity's portfolio, *or* the aggregate net notional value of such trading must be less than or equal to "100 percent of the liquidation value of the pool's portfolio."  77 Fed. Reg. at 11,283.  As the appellants do not directly challenge the aggregate net notional value threshold, we decline to define it further and fill the Federal Reporter with irrelevant financial

lingo.

In its Final Rule, CFTC justified its decision to return to the pre-2003 regulatory framework on the basis of "changed circumstances [that] warrant revisions to these rules." *Id.* at 11,275. According to CFTC, the 2003 "system of exemptions was appropriate because [registered investment companies] engaged in relatively little derivatives trading." *Id.* Since the 2003 amendments, however, such companies have engaged in "increased derivatives trading activities" and "now offer[] services substantially identical to those of registered entities [that] are not subject to the same regulatory oversight." *Id.* Given this changed circumstance, and Dodd-Frank's "more robust mandate to manage systemic risk and to ensure safe trading practices by entities involved in the derivatives markets," CFTC considered it necessary to narrow the exclusions from its derivatives regulation. *Id.* Following this rule change, RICs that do not satisfy the exclusion requirements must register with CFTC per § 4.5.

In adopting the heightened disclosure requirements, CFTC explained that "there currently is no source of reliable information regarding the general use of derivatives by registered investment companies." *Id.* Such information would be useful to CFTC and FSOC in performing their statutory mandates of regulating commodities trading and identifying systemic financial risks. *See id.* at 11,281.

Several commenters called the Commission's attention to possible inconsistencies with or redundancies to SEC compliance requirements. In response to those commenters, and concurrently with the issuance of the Final Rule, CFTC issued a notice of proposed rulemaking to harmonize CFTC and SEC's compliance requirements. *See* Harmonization of Compliance Obligations for Registered Investment Companies Required To

Register as Commodity Pool Operators, 77 Fed. Reg. 11,345 (Feb. 24, 2012). In this notice, CFTC stated that it may change certain disclosure requirements to harmonize them with SEC requirements but, importantly, it does not plan to change the new reporting requirements promulgated in the Final Rule and contained in 17 C.F.R. § 4.27. *See id.*; *see also Investment Company Institute*, 891 F. Supp. 2d at 183. The § 4.27 reporting requirements, however, are suspended for registered investment companies until CFTC and SEC promulgate a Final Rule on harmonization. *See id.* at 183–84.

## C. *Procedural History*

The Investment Company Institute and the Chamber of Commerce filed suit in the district court against CFTC, alleging that CFTC violated APA and CEA requirements in promulgating the amendments to § 4.5 and § 4.27. *Investment Company Institute*, 891 F. Supp. 2d at 184. The business associations moved for summary judgment, and CFTC cross-moved for summary judgment and moved to dismiss in part. *Id.* at 167. The district court granted CFTC's motion to dismiss in part, ruling that the associations' challenge to certain compliance obligations (other than those arising under § 4.27) was unripe because the Final Rule states that those obligations are subject to change during the harmonization process. *Id.* at 205. The associations do not appeal that dismissal. The associations do, however, appeal the district court's grant of summary judgment in favor of CFTC with regard to the other issues raised in the associations' complaint.

## II. DISCUSSION

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Our review of a district court's grant of summary judgment is *de novo*. *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011). There being no genuine dispute as to any material fact, the only question before us is whether CFTC is entitled to judgment as a matter of law. *See Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012). Under the APA, we must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "Although the 'scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency,' we must nonetheless be sure [CFTC] has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Chamber of Commerce v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Appellants contend that CFTC violated the APA in its rulemaking by: (1) failing to address its own 2003 rationales for broadening CPO exemptions; (2) failing to comply with the Commodity Exchange Act and offering an inadequate evaluation of the rule's costs and benefits; (3) including swaps in the trading threshold, restricting its definition of bona fide hedging, and failing to justify the five percent threshold; and, (4) failing to provide an adequate opportunity for notice and comment. We address each contention in turn.

*A. Change in Agency Position*

The appellants first contend that CFTC failed to explain why it changed from its more generous exemption requirements that had existed since 2003 to the more stringent requirements

contained in the Final Rule. Though it is true that the Final Rule stated that investment companies are increasing their participation in derivatives markets, the 2003 rule was explicitly designed to promote liquidity in the commodities markets by making it easier for registered investment companies to participate in derivatives markets. CFTC, according to the appellants, completely failed to address the liquidity issue, and therefore its change in position was arbitrary and capricious.

We disagree. An agency changing course "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Appellants do not argue that the new rule is impermissible under CFTC's statutory framework. Instead, appellants argue that CFTC had an obligation to address the rule's impact on liquidity. But the APA imposes no heightened obligation on agencies to explain "why the original reasons for adopting the displaced rule or policy are no longer dispositive." *Id.* at 514 (internal quotation marks and citation omitted). So long as CFTC provided a reasoned explanation for its regulation, and the reviewing court can "reasonably . . . discern[]" the agency's path, we must uphold the regulation, even if the agency's decision has "less than ideal clarity." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

CFTC's regulation clears this low bar. CFTC explicitly acknowledged that it was changing its position from its 2003 rulemaking. The Final Rule detailed the changed circumstances that prompted CFTC to amend the rule, including increased derivatives trading by investment companies (an issue inherently tied to liquidity) and a perceived lack of market transparency that could lead to a buildup of systemic risk. *See* 77 Fed. Reg.

at 11,275, 11,277.  It is clear that the Commission, in adopting the changes and the rule, was attempting to respond to those changed circumstances by adding registration and reporting requirements.  As is clear from our discussion of the regulatory and statutory history above, the Commission's requirements followed a congressional shift evidenced in the Dodd-Frank Act—legislation expressly relied upon by the Commission.  *See id.* at 11,252.  Such reasoned decisionmaking is an acceptable way to change CFTC's past rules, *cf. Fox*, 556 U.S. at 517, the appellants' policy disagreements with CFTC notwithstanding. The law requires no more.

*B.  Cost-Benefit Analysis*

Appellants next contend that CFTC failed to adequately consider the costs and benefits of the rule.  The Commodity Exchange Act requires that CFTC "consider the costs and benefits" of its actions and "evaluate[]" those costs and benefits "in light of" five factors: "(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations."  7 U.S.C. § 19(a)(2).  As a reviewing court, "[o]ur role is to determine whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (internal quotation marks omitted) (quoting *State Farm*, 463 U.S. at 43).

First, appellants argue that CFTC ignored existing SEC regulations that could provide the necessary information about investment companies' activities in derivatives markets. Appellants point to two recent cases in which we vacated SEC

regulations because SEC had failed to address existing regulatory requirements to determine whether sufficient protections were already present. *See Business Roundtable v. SEC*, 647 F.3d 1144, 1154 (D.C. Cir. 2011); *American Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 179 (D.C. Cir. 2010). According to the appellants, CFTC similarly failed to consider whether existing regulations made its proposed regulation unnecessary.

We are unconvinced. In its Final Rule, CFTC explicitly discussed SEC's oversight in the derivatives markets: "In its recent concept release regarding the use of derivatives by registered investment companies, the SEC noted that although its staff had addressed issues related to derivatives on a case-by-case basis, it had not developed a 'comprehensive and systematic approach to derivatives related issues.'" 77 Fed. Reg. at 11,255 (quoting Use of Derivatives by Investment Companies Under the Investment Company Act of 1940, 76 Fed. Reg. 55,237, 55,239 (Sept. 7, 2011)). CFTC surveyed the existing regulatory landscape and concluded that it "is in the best position to oversee entities engaged in more than a limited amount of non-hedging derivatives trading." *Id.*; *see also id.* at 11,278. CFTC found that its registration and reporting requirements could fill gaps in current regulations, explaining that only it has the authority "to take punitive and/or remedial action against registered entities for violations of the CEA or of the Commission's regulations." *Id.* at 11,254. It explained how the new § 4.27 forms would collect information from entities registered under § 4.5 that would not otherwise be collected by SEC. *See id.* at 11,275. Further, CFTC issued a harmonization proposal to ensure that its rules do not duplicate or contradict SEC regulations. *See* 77 Fed. Reg. 11,345.

These explanations suffice to justify the marginal benefit of CFTC regulation of registered investment companies in the

derivatives markets, and distinguish this case from *Business Roundtable* and *American Equity*. In *Business Roundtable*, we vacated an SEC rule because SEC had "failed adequately to address whether the regulatory requirements of the [Investment Company Act] reduce the need for, and hence the benefit to be had from" additional regulations. 647 F.3d at 1154. In *American Equity*, we determined that SEC acted in an arbitrary and capricious manner because it completely failed to "assess the baseline level of price transparency and information disclosure under state law." 613 F.3d at 178. In fact, SEC had stated that it considered state regulatory regimes "not relevant." *Id.* As the district court rightly held, these cases are "plainly distinguishable" from the present case. *Investment Company Institute*, 891 F. Supp. 2d at 219. As the district court noted, unlike the SEC in the other two cases, "CFTC *did* consider whether RICs were otherwise regulated, and concluded that CFTC regulation was necessary" despite the existing SEC regime. *Id.* at 217. Moreover, CFTC issued a notice of proposed rulemaking for a harmonization, the entire purpose of which was to synchronize SEC and CFTC regulations, further distinguishing this case from *American Equity* and *Business Roundtable*.

Appellants next argue that CFTC, by engaging in a multi-step rulemaking with some regulations becoming final now and other regulations becoming final only after harmonization with SEC regulations, made it impossible to determine the costs and benefits of its rule. The thrust of the appellants' argument is that CFTC counted benefits that may not materialize and depend on the harmonization rule while ignoring costs that may result from that rule.

We again reject the appellants' argument. In its Final Rule, CFTC explicitly listed and analyzed the five statutory factors that it must take into account when "consider[ing]" and

"evalulat[ing]" the costs and benefits of a rule. 7 U.S.C. § 19(a); *see* 77 Fed. Reg. at 11,275–83. It had no obligation to consider hypothetical costs that may never arise. The statute only requires the Commission to address costs and benefits "[b]efore promulgating a regulation." 7 U.S.C. § 19(a)(1). CFTC stated that it had not finalized several disclosure requirements (not including the requirements in § 4.27) and would not do so until after harmonization. *See* 77 Fed. Reg. 11,345. We see at least two good reasons that CFTC need not count costs from these potential disclosure requirements. First, the statute does not mandate it, and second, it would be quite literally impossible to calculate the costs of an unknown regulation. And as the Supreme Court has emphasized, "[n]othing prohibits federal agencies from moving in an incremental manner." *Fox*, 556 U.S. at 522. CFTC counsel correctly stated at oral argument that CFTC must consider and evaluate the costs and benefits of its harmonization rulemaking during that rulemaking, and the appellants can challenge that rule when it is finalized. *See* Oral Arg. Recording at 33:30–34:30. As the district court opined, "The time for any challenge to any new compliance obligations is when the final harmonization rule has been released and the nature of those obligations is clear." *Investment Company Institute*, 891 F. Supp. 2d at 205.

The appellants also assert that the agency improperly counted hypothetical benefits, but this assertion is incorrect. It was appropriate for CFTC to count the benefits flowing from its registration and disclosure requirements in § 4.5 and § 4.27, as the specifics of those requirements are finalized and not subject to the harmonization rule.[1] The appellants further complain that

---

[1]Unlike the cost posited by the appellants as unconsidered, the benefits upon which the Commission relies are not hypothetical. The Commission's analysis relies upon the benefits as being established in the ungarnished application of § 4.5 and § 4.27, not in the

CFTC failed to put a precise number on the benefit of data collection in preventing future financial crises. But the law does not require agencies to measure the immeasurable. CFTC's discussion of unquantifiable benefits fulfills its statutory obligation to consider and evaluate potential costs and benefits. *See Fox*, 556 U.S. at 519 (holding that agencies are not required to "adduce empirical data that" cannot be obtained). Where Congress has required "rigorous, quantitative economic analysis," it has made that requirement clear in the agency's statute, but it imposed no such requirement here. *American Financial Services Ass'n v. FTC*, 767 F.2d 957, 986 (D.C. Cir. 1985); *cf., e.g.*, 2 U.S.C. § 1532(a) (requiring the agency to "prepare a written statement containing . . . a qualitative and quantitative assessment of the anticipated costs and benefits" that includes, among other things, "estimates by the agency of the [rule's] effect on the national economy").

Finally, the appellants argue that CFTC failed to consider the relevant costs and benefits of its rule because it had not yet adopted a definition of swaps and it did not obtain some market data suggested by commenters. But Dodd-Frank includes a detailed definition of "swap," *see* 7 U.S.C. § 1a(47). Further, CFTC stated in a previous proposed rulemaking that "extensive further definition of the term[] by rule is not necessary." Joint Proposed Rule, Further Definition of "Swap," 76 Fed. Reg. 29,818, 29,821 (May 23, 2011) (internal quotation marks omitted). Given that the Commission explained the lack of need for significant additions to the definition in Dodd-Frank, it was not arbitrary or capricious for it to view any costs resulting from the lack of a CFTC regulation defining "swap" as minimal. In

harmonization rule. Of course if it should materialize that the harmonization in some fashion destroys those benefits, appellants would then be free to raise the resulting imbalance of costs and benefits in a challenge to the harmonization rule.

any event, in light of a final rule defining "swap" in essentially the same way as Dodd-Frank, *see* Further Definition of "Swap," 77 Fed. Reg. 48,208 (Aug. 13, 2012), the appellants can show no "prejudicial error." 5 U.S.C. § 706.

The appellants also fail to show that CFTC's refusal to gather additional market data as suggested by commenters was arbitrary or capricious. CFTC acknowledged that its data was limited in some respects, *see* 77 Fed. Reg. at 11,278, but that is true in practically any regulatory endeavor. CFTC adequately considered the costs and benefits of the rule given this uncertainty, explaining that the commenters provided no data that "would warrant deviation" from the proposed rule, given the rule's "costs and benefits." *Id.* CFTC went on to explain that "[t]hese data limitations are one reason why the Commission is pursuing additional data collection initiatives under these final rules." *Id.* at 11,278 n.229. In essence, the appellants are challenging the very method for obtaining the data they want on the ground that CFTC has not yet obtained the data they want. But neither the APA nor the CEA imposes such a catch-22 on CFTC. We hold that CFTC's consideration and evaluation of the rule's costs and benefits was not arbitrary or capricious.

## C. The Rule's Particulars

The appellants challenge three particular aspects of the Final Rule. The first is CFTC's decision to include swap transactions in the registration threshold, which has the effect of requiring more investment companies to register pursuant to § 4.5. The appellants claim that this decision was arbitrary and capricious because Dodd-Frank implemented a separate reporting framework with regard to swaps. Appellants contend that one of CFTC's responses to this claim, that participation in swaps would trigger the registration requirement even if CFTC

based its threshold only on futures and options, is irrational and obviously incorrect.

Though we agree that this particular response offers "less than ideal clarity," CFTC gave sufficient other explanations for including swap trades in the § 4.5 trading threshold that we can "reasonably . . . discern[]" its rationale. *Bowman*, 419 U.S. at 286. The Final Rule explained that "[t]he Dodd-Frank Act amended the statutory definition of the terms 'commodity pool operator' and 'commodity pool' to include those entities that trade swaps," evidencing that swaps were a central concern of the statute. 77 Fed. Reg. at 11,258. The rule further explained that CFTC would use information obtained "from CPOs transacting in swaps" to "help to bring transparency to the swaps markets, as well as to the interaction of swaps and futures markets, protecting the participants in both markets from potentially negative behavior." *Id.* at 11,283. Given these goals, it was not arbitrary or capricious to include swaps in the § 4.5 trading threshold.

The second aspect of the rule challenged by the appellants is its definition of bona fide hedging transactions, a definition that the appellants claim is too narrow and should encompass risk management strategies in financial markets. This argument amounts to nothing more than another policy disagreement with CFTC, so we must reject it. CFTC adequately explained that it was rejecting the broader "risk management" definition because "bona fide hedging transactions are unlikely to present the same level of market risk [as risk management transactions] as they are offset by exposure in the physical markets." *Id.* at 11,256. It also found that the risk management definition would be difficult to "properly limit" and make its exclusion "onerous to enforce." *Id.* Given the deference appropriate to such expert determinations, we reject the appellants' challenge to this aspect of the rule. *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095,

1105 (D.C. Cir. 2009) ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments . . . .").

We further reject the appellants' contention that this aspect of the rule must be vacated because the bona fide hedging definition was cross-referenced to another rule that was recently vacated. *See Int'l Swaps & Derivatives Ass'n v. CFTC*, 887 F. Supp. 2d 259 (D.D.C. 2012). The decision vacating the cross-referenced rule had nothing to do with the bona fide exception in this rule, and the fact that the definition here was cross-referenced instead of reproduced does not make it automatically invalid.

The third and final particular aspect of the rule challenged by the appellants is the five percent registration threshold for § 4.5, which the appellants argue is too low. Our cases explain the appropriate deference given to these types of agency determinations:

> It is true that an agency may not pluck a number out of thin air when it promulgates rules in which percentage terms play a critical role. When a line has to be drawn, however, [CFTC] is authorized to make a rational legislative-type judgment. If the figure selected by the agency reflects its informed discretion, and is neither patently unreasonable nor a dictate of unbridled whim, then the agency's decision adequately satisfies the standard of review.

*WJG Telephone Co. v. FCC*, 675 F.2d 386, 388–89 (D.C. Cir. 1982) (internal quotation marks and citations omitted). CFTC offered a reasoned explanation for its choice of five percent, finding that "trading exceeding five percent of the liquidation value of a portfolio evidences a significant exposure to the derivatives markets." 77 Fed. Reg. at 11,278. According to the

Final Rule, the five percent threshold is appropriate because "it is possible for a commodity pool to have a portfolio that is sizeable enough that even if just five percent of the pool's portfolio were committed to margin for futures, the pool's portfolio could be so significant that the commodity pool would constitute a major participant in the futures market." *Id.* at 11,262 (quoting 76 Fed. Reg. at 7,985). We defer to CFTC's judgment and hold that adopting the five percent threshold was neither arbitrary nor capricious.

## *D. Notice and Comment*

Finally, appellants contend that CFTC failed to provide adequate opportunity for notice and comment both because the proposal's cost-benefit discussion did not set out the basis for the Final Rule's analysis and because CFTC did not give commenters notice of the seven-factor marketing test. We disagree. The APA requires "reference to the legal authority under which the rule is proposed" and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). The proposed rule included a separate section entitled "Cost-Benefit Analysis" that gave adequate notice of CFTC's approach to the cost-benefit analysis by setting forth the factors that CFTC would consider and summarizing expected costs and benefits. *See* 76 Fed. Reg. at 7,988.

As for the seven-factor marketing test, no notice and comment was required. The APA's notice-and-comment provision does not apply to "general statements of policy," 5 U.S.C. § 553(b)(3)(A), and the seven factors were included in the rule only as guidance. *See* 77 Fed. Reg. at 11,258–59. The rule explicitly states that CFTC "will determine whether a violation of the marketing restriction exists on a case by case basis through an examination of the relevant facts." *Id.* at

11,259. Even if these factors were not included as a mere statement of policy, the appellants do not even attempt to show that any prejudice resulted from this failure to provide notice, as they must to succeed on such a claim. *See* 5 U.S.C. § 706; *American Coke & Coal Chemicals Institute v. EPA*, 452 F.3d 930, 939 (D.C. Cir. 2006).

## III.  CONCLUSION

For the foregoing reasons, the decision of the district court is

*Affirmed.*